UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:19-cv-00694-FDW-DSC

| | |
|---|---|
| JILL ROE,⟩<br><br>Plaintiff,⟩<br><br>vs.⟩<br><br>CHARLOTTE-MECKLENBURG BOARD⟩<br>OF EDUCATION; MARK BOSCO, in his⟩<br>individual capacity and as an employee of⟩<br>Charlotte-Mecklenburg Schools;⟩<br>BRADLEY LEAK, both individually and as⟩<br>an agent of Charlotte-Mecklenburg Schools,⟩<br>and in his official capacity as a law⟩<br>enforcement officer of the Charlotte-⟩<br>Mecklenburg Police Department; THE CITY⟩<br>OF CHARLOTTE, a North Carolina⟩<br>Municipality; and KERR PUTNEY, in his⟩<br>official capacity as Chief of the Charlotte-⟩<br>Mecklenburg Police Department,⟩<br><br>Defendants.⟩ | ORDER |

THIS MATTER is before the Court on Defendants Charlotte-Mecklenburg Board of

Education, Mark Bosco, Bradley Leak, City of Charlotte, and Kerr Putney's Motions to Dismiss

Plaintiff's Complaint.[1] (Doc. Nos. 19, 25-1, 26). In the interest of judicial efficiency, all Motions

to Dismiss are considered in this Order. Having considered the Motions, the Court hereby

GRANTS Defendant Leak's Motion to Dismiss, GRANTS IN PART and DENIES IN PART

---

[1] In her Opposition Motions, Plaintiff urges this Court to construe Defendants' Motions to Dismiss as Motions for Judgment on the Pleadings because each Defendant filed their Motion to Dismiss after their respective Answers. (Doc. No. 22, p. 1, Doc. No. 28, p. 2, Doc. No. 30, p.3). However, all three Defendants properly reserved their right to file a separate Motion to Dismiss pursuant to Local Rule 7.1(c)(1). (Doc. No. 16, p. 1, Doc. No. 17, p. 2, Doc. No. 18, p. 1). Accordingly, this Court will construe Defendants' Motions pursuant to F.R.C.P. 12(b)(6).

1

Defendants Board and Bosco's Motion to Dismiss, and GRANTS Defendants City and Putney's Motion to Dismiss.

## I.    BACKGROUND

This case arrived before the Court with difficult and heart wrenching allegations.[2]  During the times relevant to the Complaint, Plaintiff Jane Roe ("Roe") was a high school student at Myers Park High School ("MPHS") in Charlotte, North Carolina.  Sometime around March 2014, Roe began dating M.G., who, like Roe, was a freshman at MPHS.  (Doc. No. 1, ¶ 22).  After a few months, Roe believed M.G. became "controlling and abusive," and ended the relationship in July the same year.  Id.  Shortly after the breakup, M.G. told Roe he attempted suicide because she ended the relationship, which resulted in M.G. being hospitalized.  Id. at ¶ 23.  Around the same time, he began sending Roe text messages several times per week threatening to inflict bodily injury on himself if she did not resume dating him, going so far as to threaten sending pictures of him slitting his wrists with a razor blade.  Id. at ¶ 23-24.  For M.G. to cease the threats, M.G. told Roe she had to send explicit images of herself—only then would he not hurt himself.  Id. at ¶ 24.

Although a new academic year would bring excitement and new hope for many students, Roe began the year fighting the same battles with which she ended the prior year.  In September 2014 (their sophomore year), M.G. continued his threatening behavior, this time sending daily messages.  Id. at ¶ 25.  Roe, however, refused to comply with M.G.'s threats, and when she did, M.G. threatened to send explicit images of her to their friends and classmates at MPHS.  Id.  On at least one occasion, Roe alleges M.G. did, in fact, disseminate explicit images of her in an effort

---

[2] The background described herein is taken from Plaintiff's Complaint (Doc. No. 1) and all allegations are treated as true for purposes of ruling on these motions.  Nothing described in this section—or this order—should be construed as the Court making any findings of fact.

to humiliate and control her.  Id.

As the semester continued, M.G. demanded Roe meet with him in person, which she avoided for some time.  Id. at ¶ 26.  By October 2014, however, M.G. and Roe met at Freedom Park in Charlotte where M.G. physically forced her to perform oral sex on him.  Id.  Roe did not report the abuse to anyone.  Id.  M.G. later apologized to Roe and promised to never force oral sex on her again, yet Roe alleges he continued to sexually harass and threaten her through text messages.  Id. at ¶ 27.  Eventually, Roe disclosed the harassment and abuse to a friend and fellow classmate, C.H., who encouraged her to report the abuse to CMS and the Charlotte-Mecklenburg Police Department ("CMPD").  Id. at ¶ 28.  Roe once again declined to report the abuse.  Id.

Later the same month, M.G. sent Roe another message suggesting they should meet after school outside MPHS.  Id. at ¶ 29.  Afraid of another sexual assault, Roe declined M.G.'s request and shared her fears with C.H.  Id.  After class, M.G. allegedly stalked Roe and tried to force her into the woods adjacent to campus.  Id.  At this time, C.H. intervened, claiming C.H. and Roe needed to work together on an assignment, thus leaving M.G.  Id.  After this incident, M.G. allegedly threatened, via text message, to rape Roe.  Id. at ¶ 30.  Once again, M.G. later apologized for his actions, claiming to have lost his temper, yet blamed Roe for upsetting him.  Id.

The day after M.G. tried to force Roe into the woods, M.G. sent another text message to Roe while they were in class.  Id. at ¶ 31.  This time, however, the threat was significantly different: M.G. stated he had a gun in his backpack and would shoot himself if Roe did not agree to meet M.G. after school.  Id.  As part of the threat, M.G. further told Roe that if she told anyone or sought help, it would only make matters worse.  Id.  Afraid for the safety of herself and other students at MPHS, Roe agreed to meet after class, although she tried to negotiate with M.G. that he would not

3

attempt to force any sexual activity when they met after class.  Id. at ¶ 32.  Roe's pleas were ignored, and M.G. allegedly raped her in the woods adjacent to MPHS.  Id. at ¶ 33-34.  As she returned to campus, Roe sent text messages to C.H. claiming she had been raped, whereupon C.H. encouraged Roe to report M.G. to the proper authorities.  Id. at ¶ 35.  Roe did not report the alleged rape except to another student, J.M., the following day, who likewise encouraged her to report the alleged rape to the proper authorities; Roe declined to do so, but ultimately agreed to meet with J.M. after school to protect her from further encounters with M.G.  Id. at ¶ 36.

When Roe met with J.M. after school, she found him with Ms. Stacey Weinstein, MPHS site coordinator for Communities in Schools ("CIS").  Id. at ¶ 37.  At this point, Roe finally reported that M.G. had been sexually harassing her and had recently raped her in the woods next to MPHS.  Id.  Weinstein allegedly told Roe that MPHS would take appropriate action on the report, though Roe contends Weinstein did not provide any additional information about her rights or options.  Id.  Weinstein subsequently reported the incident to CMS and an official contacted M.G.'s mother.  Id. at ¶ 38.  For a few weeks, M.G. did not contact Roe, but in November 2014, he began sending Roe messages, blaming her for getting him in trouble and demanding additional explicit photographs and videos.  Id. at ¶ 39.  Roe did not report the continued harassment.  Id.

At some point—it is not clear in the Complaint—Roe disclosed the harassment to another MPHS student, J.F.  Id. at ¶ 40.  J.F., like J.M., encouraged Roe to report the harassment to CMS and Kimberly Folk, MPHS Counselor.  Id.  In December 2014, Roe, with J.F. and another mutual friend, finally reported M.G.'s alleged violence, harassment, and rape to Folk.  Id.  Roe contends Folk failed to inform her of any of her rights or options, but instead directed Roe to report to Defendant Bradley Leak ("Leak"), the School Safety Resource Officer ("SSRO") for MPHS.  Id.

4

at ¶ 41.  Folk did not report the rape to CMS, CMPD, Roe's parents, or any other authority.  Id.

During the following school day, Roe went to Leak's office to report M.G.'s alleged transgressions.  Id. at ¶ 42.  Leak questioned Roe about the rape in the woods, whereupon Roe provided M.G.'s text messages to Leak.  Id.  Leak then asked Roe to return at the end of the school day to meet with himself and Defendant Mark Bosco ("Bosco"), Principal of MPHS.  Id.  Leak allegedly claimed that M.G.'s threat to use the gun on himself or other students did not constitute "reasonable duress" required for a criminal rape charge.  Id.  Leak did not report the sexual abuse to Roe's parents, nor did he act upon M.G.'s text messages stating he had brought a gun to school. Id.  Bosco then shared with Roe that he reviewed the text messages between her and M.G.  Id.  He allegedly offered to meet with M.G. to discuss the "proper way to treat a lady," but Roe contends he did not offer protective measures or corrective actions to prevent the ongoing harassment.  Id. Bosco further informed Roe that she could make a formal report against M.G.  Id.  When discussing this option, Bosco advised Roe of the potential adverse consequences of filing a report, namely, that if M.G. were found innocent, then Roe would be suspended for having sex on campus.  Id. at ¶ 45.  Roe ultimately decided against making a formal report.  Id.  Bosco did, ultimately, contact Roe's mother.  Id. at ¶ 47.  Bosco did not provide information to either Roe or her mother about Roe's rights and options under Title IX after Roe again declined to make a formal report.  Id. at ¶ 48.

During the remainder of the semester, Roe struggled academically, missing school, suffering mental breakdowns, and otherwise being emotionally distressed.  Id. at ¶ 50.  Although she sought to avoid M.G. while on campus, she nonetheless continued to encounter him.  Id. at ¶ 52. CMS also assigned Roe and M.G. to the same lunch period during multiple semesters in later

years, which prompted her to leave the cafeteria and eventually begin skipping lunch or eating by herself in classrooms. Id. During the remainder of her time at MPHS, Roe contends neither CMS nor any of its officials provided information about her rights under Title IX. Id. at ¶ 53.

The following school year—during the Fall 2015 semester—Bosco held a school assembly to discuss known problems occurring in the woods adjacent to MPHS. Id. at ¶ 55. At this assembly, Bosco made a comment that "some people go into the woods and don't come back happy" and warned female students that CMS and its officials could not protect them if they went into the woods. Id. By the same token, Bosco informed male students that they would be treated as "guilty until proven innocent," as that is "just the price [men] pay for being men." Id. At some point after this assembly, MPHS students began joking about Bosco's remarks, leading to the sharing of internet memes and repeating of jokes. Id. at ¶ 56. Roe alleges she felt pressured to participate in the jokes in order to avoid identification as a victim, causing her distress. Id. Later during the 2015-2016 academic year, another sexual assault reportedly occurred in the same woods. Id. at ¶ 57.

Throughout the remainder of her high school career and into college, Roe alleges she has struggled with depression, anxiety, flashbacks, panic attacks, suicidal ideation, self-harm, and several other symptoms of her post-traumatic stress disorder ("PTSD"). Id. at ¶ 59. Roe did not seek counseling, therapy, or other treatment while a MPHS student. Id. at ¶ 60. Roe likewise did not access the counseling office at MPHS because she felt Folk did not properly handle her report. Id. As a result of the lack of treatment, Roe alleges, her symptoms were exacerbated. Id. These symptoms continued when she matriculated in college, withdrawing on two different occasions and ultimately entering a residential treatment facility to receive in-patient care for her PTSD and

6

related symptoms.  Id. at ¶ 61-62.  Roe has since fallen two academic years behind and has transferred to another school to be closer to home.  Id. at ¶ 62-63.

Plaintiff filed her Complaint on December 20, 2019 against the above-named defendants. See (Doc. No. 1).  At various points, Defendants Bosco and CMS filed a motion to dismiss (Doc. No. 19); Defendants Putney and City filed a motion to dismiss (Doc. No. 25); and Defendant Leak filed a motion to dismiss (Doc. No. 26).  The motions have been fully briefed and are ripe for review.  The Court addresses each motion herein, although not necessarily in the order presented.

## II.    STANDARD OF REVIEW

### A.  Subject Mater Jurisdiction

Rule 12(b)(1) provides for dismissal of claims against all defendants where the Court lacks jurisdiction over the subject matter of the lawsuit.  Lack of subject matter jurisdiction may be raised at any time either by a litigant or the court.  Mansfield, C. & L.M. Ry. Co. v. Swan, 111 U.S. 379, 382 (1884).  The ability of the court to independently address subject matter jurisdiction is important to finality inasmuch as a litigant, even one who remains silent on the issue of jurisdiction, may wait until they receive an adverse judgment from a district court and raise the issue of subject matter jurisdiction for the first time on appeal, thereby voiding the judgment. Capron v. Van Noorden, 2 Cranch 126, 127, 2 L.Ed. 229 (1804).  The Federal Rules of Civil Procedure anticipate this issue and provide that "If the court determines at any time that it lacks subject-matter jurisdiction, the court *must* dismiss the action."  Fed. R. Civ. P. 12(h)(3) (emphasis added).

When a court considers its subject matter jurisdiction, the burden of proof is on the plaintiff. Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982).  In Richmond, Fredericksburg & Potomac

7

R.R. Co. V. United States, 945 F.2d 765 (4th Cir. 1991) (Ervin, C.J.), the Court of Appeals for the

Fourth Circuit held as follows:

> In determining whether jurisdiction exists, the district court is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment. The district court should apply the standard applicable to a motion for summary judgment, under which the nonmoving party must set forth specific facts beyond the pleadings to show that a genuine issue of material fact exists. The moving party should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law. A district court order dismissing a case on the grounds that the undisputed facts establish a lack of subject matter jurisdiction is a legal determination subject to de novo appellate review.

> Id., at 768-69 (citations omitted).

## B. Personal Jurisdiction

"When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff

ultimately bears the burden of proving to the district court judge the existence of jurisdiction over

the defendant by a preponderance of the evidence[.]" New Wellington Fin. Corp. v. Flagship

Resort Dev. Corp., 416 F.3d 290, 294 (4th Cir. 2005) (citing Combs v. Bakker, 886 F.2d 673, 676

(4th Cir. 1989) ). However, "[w]hen a district court considers a question of personal jurisdiction

based on the contents of a complaint and supporting affidavits, the plaintiff has the burden of

making a prima facie showing in support of its assertion of jurisdiction." Universal Leather, LLC

v. Koro Ar, S.A., 773 F.3d 553, 558 (4th Cir. 2014) (citation omitted). Under these circumstances,

a court must "assume the credibility of [the plaintiff's] version of the facts[,]" "construe all relevant

pleading allegations in the light most favorable to the plaintiff[,]" "construe any conflicting facts

in the parties' affidavits and declarations in the light most favorable to [the plaintiff,]" and "draw

the most favorable inferences for the existence of jurisdiction." Id. at 558, 560 (citations omitted); Combs, 886 F.2d at 676.

### C. Failure to State a Claim

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal when the pleading party fails to "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) tests the legal "sufficiency of a complaint" but "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992); accord E. Shore Mkts, Inc. v. J.D. Assocs. Ltd. P'ship, 213 F.3d 175, 180 (4th Cir. 2000).

A complaint attacked by a Rule 12(b)(6) motion to dismiss will survive only if it contains "enough facts to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 697 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)); see also Robinson v. American Honda Motor Co., Inc., 551 F.3d 218, 222 (4th Cir. 2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id.

### III. ANALYSIS

#### A. Defendant Leak's Motion to Dismiss

In his Motion to Dismiss, Defendant Leak argues he should be dismissed from Counts II, IV, V, and VI from the Complaint. (Doc. No. 26-1, p. 2). With respect to Count II, the Equal Protection claim, Defendant Leak argues for dismissal because Plaintiff failed to allege different

9

treatment and deliberate indifference, and because Defendant Leak is entitled to qualified immunity. Id. With respect to Counts IV and V, the negligence claims, Defendant Leak argues for dismissal because he is entitled to public official immunity. Id. Finally, with respect to Count VI, the obstruction of justice claim, Defendant Leak argues for dismissal because he was acting within his official capacity of police officer with respect to the conduct alleged and he is thus entitled to public official immunity, and the conduct alleged does not state a claim for obstruction of justice under North Carolina law. Id. For the reasons stated below Defendant Leak's Motion to Dismiss is hereby GRANTED without prejudice.

### 1. Equal Protection

The Equal Protection Clause of the Fourteenth Amendment prohibits states from denying any person equal protection of the laws. U.S. Const. amend. XIV, §1. This constitutional provision "is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985). The equal protection requirement "keeps governmental decisionmakers from treating differently persons who are in all relevant aspects alike." Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002) (citing Nordlinger v. Hahn, 505 U.S. 1, 10, 112 S. Ct. 2326, 120 L. Ed. 2d 1 (1992)). Notably, courts have held that the equal protection right to be free from gender discrimination includes the right to be free from "intentional sexual harassment" in educational or other settings. See Jennings v. Univ. of N.C., 482 F.3d 686, 725 (4th Cir. 2007) (Niemeyer, J., dissenting) (citing Beardsley v. Webb., 30 F.3d 524, 529 (4th Cir. 1994)). "To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful

discrimination." <u>Morrison v. Garraghty</u>, 239 F.3d 648, 654 (4th Cir. 2001). The Fourth Circuit also recognizes equal protection claims predicated on a theory of deliberate indifference to student-on-student sexual harassment. <u>Feminist Majority Found. v. Hurley</u>, 911 F. 3d 674, 702 (4th Cir. 2018).

> To state an equal protection claim for deliberate indifference to known student-on-student sexual harassment, a plaintiff must first allege that she was subjected to discriminatory peer harassment. Secondly, the plaintiff must allege that the school administrator responded to the discriminatory peer harassment with deliberate indifference, i.e. in a manner clearly unreasonable in light of known circumstances. In other words, the plaintiff must allege that the school administrator knew about the harassment of the plaintiff and acquiesced in that conduct by reusing to reasonably respond to it. Third, the plaintiff must allege that the school administrator's deliberate indifference was motivated by a discriminatory intent.

<u>Id.</u> at 702-03.

With respect to Defendant Leak, Plaintiff has not sufficiently alleged an Equal Protection Claim against him. The first element of the deliberate indifference claim is clearly met. Whether the second element has been sufficiently alleged—if the school administrator responded in a manner clearly unreasonable in light of known circumstances—is a closer call. When Defendant Leak was made aware of the sexual assault suffered by Plaintiff, Defendant Leak allegedly "interrogated" Plaintiff, reviewed the text messages between Plaintiff and M.G., and set up a meeting to discuss the incident with Defendant Bosco. (Doc. No. 1, pp. 11-12). In the meeting with Plaintiff and Defendant Bosco, Defendant Leak allegedly suggested that M.G.'s actions toward Plaintiff did not support a criminal charge of rape before he left the meeting. <u>Id.</u> at p. 12. Plaintiff finally alleges Defendant Leak failed to notify Plaintiff's parents or further address that M.G. brought a gun to school. <u>Id.</u> These allegations, taken in context of the broader Complaint, do not support a reasonable inference that Defendant Leak's actions were clearly unreasonable in light of known circumstances. By Plaintiff's own admission, Defendant Leak met with Plaintiff at least twice about the incident and facilitated a meeting between Plaintiff and Defendant Bosco. It

11

would not have been clearly unreasonable for Defendant Leak to end his involvement once Defendant Bosco—the school's principal—stepped in. Additionally, the allegations that Defendant Leak failed to alert Plaintiff's mother[3] about the incident and suggested M.G.'s behavior was not criminal support, at most, a reasonable inference that Defendant Leak was negligent, and negligence is simply "insufficient to support a claim of a Fourteenth Amendment violation." Young v. City of Mount Ranier, 28 F.3d 567, 577 (4th Cir. 2001).

Accordingly, Plaintiff has not sufficiently alleged Defendant Leak was deliberately indifferent and violated her right to be free from sexual harassment under the Fourteenth Amendment. Defendant Leak also contends that he is entitled to a defense of qualified immunity on the Equal Protection claim against him, which would shield him from liability (Doc. No. 26-1, p. 5-7; Doc. No. 1, p. 19). Because Plaintiff has not met her burden in alleging Defendant Leak violated her constitutional rights, this Court need not reach the issue of whether Defendant Leak is entitled to qualified immunity. Defendant Leak's Motion to Dismiss Count II of the Complaint against him is GRANTED.

### 2. Negligence

In Counts IV and V of her Complaint, Plaintiff alleges Defendant Leak was negligent in handling her reports of sexual assault and that he negligently inflicted emotional distress upon her when he indicated that M.G.'s actions were not criminal. (Doc. No. 1, pp. 27-29). Defendant Leak argues he is shielded from liability due to public official immunity. (Doc. No. 26-1, p. 7).

Under North Carolina law, "[t]he public immunity doctrine protects public officials from individual liability for negligence in the performance of their governmental or discretionary

---

[3] The Complaint indicates that Plaintiff's mother was indeed alerted to the incident by Defendant Bosco shortly after Defendant Leak left the meeting between Plaintiff, Defendant Leak, and Defendant Bosco. (Doc. No. 1, p. 12-13).

duties." Campbell v. Anderson, 156 N.C. App. 371, 576 S.E. 2d 726, 730 (2003). However, public immunity can be overcome if a plaintiff can show that the defendant's conduct was "'(1) corrupt; (2) malicious; (3) outside of and beyond the scope of [their] duties; (4) [taken] in bad faith; or (5) willful and deliberate.'" Woods v. Chapel Hill-Carborro City Schs. Bd. of Educ., 2020 WL 3065253 at *9 (M.D.N.C. June 9, 2020) (quoting Smith v. Jackson City Bd. of Educ., 168 N.C. App. 452, 608 S.E. 2d 399, 411 (2005)). "[C]onclusory allegation[s] that a public official acted willfully and wantonly [are not] sufficient, by itself, to withstand a Rule 12(b)(6) motion to dismiss. The facts alleged in the complaint must support such a conclusion." Meyer v. Walls, 347 N.C. 97, 489 S.E. 2d 880, 890 (1997).

At all times relevant to the Complaint, it is uncontested that Defendant Leak was acting within the scope of his official duties as an SSRO. Thus, he is shielded by public official immunity unless Plaintiff's Complaint alleges facts sufficient to support a reasonable inference that Defendant Leak acted maliciously, willfully, corrupt, or in bad faith. Plaintiff's Complaint asserts that Defendant Leak "acted in bad faith when [he] willfully and deliberately decided not to respond to Ms. Roe's report . . . or to disclose the rape . . . to Ms. Roe's parents." (Doc. No. 1, p. 27). The Complaint further alleges Defendant Leak "acted in bad faith" when he failed to respond to reports by Ms. Roe, and that he "misled" Ms. Roe about her options to pursue criminal charges against M.G. under state law. (Doc. No. 1, p. 29).

While it is true that failing to take remedial action after learning of student-on-student sexual abuse can rise to the level of malice necessary to overcome public official immunity, see Woods, 2020 WL 3065253 at *10 (holding that plaintiff overcame public official immunity against school administrators when they continued to allow an abusive student to interact with plaintiff

after learning of the abuse), Plaintiff has not alleged sufficient facts to overcome immunity against Defendant Leak. The Complaint makes clear that upon informing Defendant Leak of the sexual abuse, Defendant Leak "interrogated" Ms. Roe, documented the text messages from M.G. and provided them to Defendant Bosco, and scheduled a meeting with Defendant Bosco for the end of that same day. (Doc. No. 1, pp. 11-12). Defendant Leak allegedly did not immediately contact Plaintiff's mother; however, Plaintiff's mother was eventually summoned to the after-school meeting after Defendant Leak had left. Id. at pp. 12-13. As stated in Plaintiff's Complaint, Defendant Leak took some type of responsive action in his capacity as SSRO within the same day of learning of Plaintiff's report. As such, Plaintiff has not alleged facts sufficient to overcome Defendant Leak's entitlement to public official immunity. Accordingly, Defendant Leak's Motion to Dismiss Plaintiff's negligence claims against him is hereby GRANTED without prejudice.

### 3. Common Law Obstruction of Justice.

Common law obstruction of justice makes it "an offense to do any act which prevents, obstructs, impedes, or hinders public or legal justice." In re Kivett, 309 N.C. 635, 309 S.E.2d 442, 462 (1983). "North Carolina courts have held that 'any act intentionally undertaken by the defendant for the purpose of obstructing, impeding, or hindering the plaintiff's ability to seek and obtain a legal remedy will suffice to support a claim for common law obstruction of justice.'" Doe v. Putney, 2019 WL 3714459 at *8 (W.D.N.C. June 5, 2019) (quoting Blackburn v. Carbone, 208 N.C. App. 519, 526, 703 S.E. 2d 788, 795 (2010)).

Plaintiff points to Defendant Leak's alleged "fail[ure] to take a formal report from Ms. Roe" and the fact that he allegedly "misled" her about the criminality of M.G.'s actions as sufficient to support a claim of common law obstruction of justice against him. (Doc. No. 1, p. 33).

14

Plaintiff relies on <u>Doe v. Putney</u> in her Opposition Motion to urge this Court to find her obstruction of justice claim against Defendant Leak sufficient to overcome a 12(b)(6) motion. (Doc. No. 30, p. 7). Plaintiff's reliance on this case is misplaced. In <u>Doe v. Putney</u>, the magistrate judge inferred a plausible obstruction of justice claim against a defendant at the 12(b)(6) stage when the defendant *falsified* a formal report about student-on-student sexual assault. <u>Doe v. Putney</u>, 2019 WL 3714459 at *8. Defendant Leak's alleged conduct does not rise to the level of intentional conduct like that of the defendant in <u>Doe v. Putney</u> such that it supports a plausible inference of obstruction of justice. Without specific allegations of intentional or deliberate conduct by Defendant Leak, Plaintiff's Complaint does not support a reasonable inference that Defendant Leak is liable for common law obstruction of justice. Accordingly, Defendant Leak's Motion to Dismiss Count VI of the Complaint against him is GRANTED without prejudice.

### B. Defendants Board and Bosco's Motion to Dismiss

In their Motion to Dismiss, Defendants CMS and Bosco argue all counts against them should be dismissed. (Doc. No. 19-1). For the foregoing reasons, Defendants CMS and Bosco's Motion to Dismiss is hereby GRANTED IN PART AND DENIED IN PART.

### 1. Title IX Claim Against Defendant Board

Title IX provides that "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a) (2018). It is well-settled that sexual harassment qualifies as discrimination under Title IX, and, in the school context, "student-on-student sexual harassment, if sufficiently severe, can likewise rise to the level of discrimination." <u>Davis Next Friend Lasorda D. v. Monroe City, Bd. of Educ.</u>, 526 U.S.

629, 650, 119 S. Ct. 1661, 1674, 143 L. Ed. 2d 839 (1999) (citing Bennett v. Ky. Dep't of Educ., 470 U.S. 656, 665-66, 105 S. Ct. 1544, 1550 84 L. Ed. 2d 590 (1985)). To state a Title IX claim against an institution based on sexual harassment, a plaintiff must sufficiently allege four elements:

> (1) she was a student at an educational institution receiving federal funds, (2) she was subjected to harassment based on her sex, (3) the harassment was sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity, and (4) there is a basis for imputing liability to the institution.

Jennings v. Univ. of N.C, 482 F. 3d 686, 695 (4th Cir. 2007) (citation omitted). In order to impute liability to an institutional defendant for a Title IX violation, Plaintiff must point to "an official who . . . has authority to address the alleged discrimination in the [institution's] programs and fails adequately to respond" or displays "deliberate indifference" to the discrimination. Id. at 700. (quoting Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998); see also Doe v. Bd. of Educ. of Prince George's City., 888 F. Supp. 2d 659, 666 (D. Md. 2012); Fitzgerald v. Barnstable Sch. Comm., 555 U.S. 246, 257, 129 S. Ct. 788, 797, 172 L. Ed. 2d 582 (2009) ("[A] Title IX plaintiff can establish school district liability by showing that a single school administrator with authority to take corrective action responded to harassment with deliberate indifference."); Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 654, 119 S. Ct. 1661, 1676, 143 L. Ed. 2d 839 (1999) ("The complaint also suggests that petitioner may be able to show both actual knowledge and deliberate indifference on the part of the Board which made no effort whatsoever either to investigate or to put an end to the harassment.").

Defendant Board does not contest the sufficiency of the factual allegations as to the first three elements of the Title IX claim. (Doc. No. 19-1, p. 4). Indeed, this Court finds Plaintiff sufficiently states facts supporting each of the first three elements with respect to Defendant

Board.[4] At issue, therefore, is whether Plaintiff sufficiently alleged facts to show Defendant Board had actual notice or that the Board responded to the harassment and abuse with deliberate indifference.

A school board may be said to have actual notice of sexual harassment where school officials have actual knowledge of student-on-student harassment. See Davis Next Friend Lashonda D., 526 U.S. at 654 (reversing lower court's dismissal of Title IX case against school board where Plaintiff alleged principal had actual knowledge of sexual harassment). School officials are put on notice when incidents of student-on-student harassment are repeatedly reported to those officials with authority to take remedial action. Doe v. Bd. of Educ. of Prince George's City, 888 F. Supp. 2d at 667.

A school board that receives federal funding may be liable for harassment under Title IX where the board's deliberate indifference effectively subjects students under the board's supervision to harassment. See Davis Next Friend Lashonda D., 526 U.S. at 644-45, 119 S. Ct. at 1672 (stating a board's deliberate indifference must be such that it makes students vulnerable to harassment). Students may be found to be under the supervision of a school board in situations where they are on school grounds during school hours or otherwise taking part in school activities. Id. at 630, 119 S. Ct. at 1665. Where ongoing sexual harassment is reported to authorities capable of taking remedial action on behalf of an institution, and those authorities fail to take action to address the harassment, the institution may be held liable for deliberate indifference. See id. at 651, 119 S. Ct. at 1675 (illustrating deliberate indifference through a hypothetical scenario where school administrators' dismissal of female students' reports asserting harassment from male

---

[4] With respect to Defendant City, this Court finds Plaintiff did not sufficiently alleged the first element of a Title IX Claim. *Infra* pp. 27-30.

students is preventing them from using school resources); <u>Jennings v. Univ. of N.C.</u>, 482 F.3d at 700.

In the instant case and construing the factual allegations in the light most favorable to Plaintiff, the Complaint sufficiently states a facially plausible Title IX claim against the Board. Contrary to the Board's arguments, it is clear that Plaintiff reported the abuse to *someone* with the authority to take remedial action, whether it was Stacey Weinstein, Kimberly Folk, Defendant Leak, or Defendant Bosco. Moreover, that Plaintiff was allegedly assigned to the same lunch period as M.G. *after* the abuse occurred sufficiently states a plausible claim that Defendant Board was deliberately indifference. The Court therefore DENIES Defendant Board's Motion to Dismiss the Title IX claim (Count I). Defendant Board is free to reassert any arguments in its Motion to Dismiss again at summary judgment.

### 2. § 1983 Claim Against Defendant Board

Defendant Board also seeks dismissal of Plaintiff's § 1983 claims based on student-on-student sexual harassment in violation of Title IX the Equal Protection Clause. Count II alleges Defendant Board violated the Equal Protection Clause through its custom, policy, or practice of deliberate indifference to student-on-student sexual harassment and abuse. (Doc. No. 1, p. 19). Count III alleges Defendant Board violated both Title IX and the Equal Protection Clause because it failed to adequately train its employees in responding to student-on-student sexual harassment and abuse. <u>Id.</u> at p. 25.

To state a claim under 42 U.S.C. § 1983 against a school board for violation of the Equal Protection Clause, a plaintiff must assert the alleged harassment resulted from a "municipal custom, policy, or practice." <u>Fitzgerald v. Barnstable Sch. Comm.</u>, 555 U.S. 246, 25758, 129 S.

Ct. 788, 797, 172 L. Ed. 2d 582 (2009) (citing Monell v. Dep't of Soc. Servs. Of City of N.Y., 436 U.S. 658, 694, 98 S. Ct. 2018, 2037-38, 56 L. Ed. 2d 611 (1978)). Defendant Board specifically argues Plaintiff failed to allege facts indicating the harassment or the school's response thereto was the product of a custom, policy, or practice of the Board. (Doc. No. 19-1, p. 10). However, a plaintiff may establish the existence of an official policy by asserting either the omissions or affirmative acts of supervisory officials. Avery v. Burke City, 660 F.2d 111, 114 (4th Cir. 1981). Under § 1983, liability attaches to those supervisory officials responsible for rule-making who unreasonably fail to establish rules or policies, thereby causing their employees' constitutional violations. Withers v. Levine, 615 F. 2d 158 (4th Cir. 1980).

Here, Plaintiff alleges CMS had a custom, policy, or practice of deliberate indifference to student-on-student sexual harassment and abuse. (Doc. No. 1, p. 21). Specifically, Plaintiff asserts Defendant Bosco "discouraged" Plaintiff from making a formal report about the abuse she suffered, because "if M.G. were 'found innocent,' [Plaintiff] would be suspended for having sex on campus." (Doc. No. 1, p. 12). Plaintiff also alleges other statements made by Defendant Bosco[5] "perpetuat[ed] the hostile environment at MPHS. Id. at p. 21. Accepting these allegations as true and construing them in the light most favorable to Plaintiff, Defendant CMS's Motion to Dismiss Counts II and III against it is DENIED. Defendant Board is free to reassert any arguments in its Motion to Dismiss again at summary judgment.

### 3. Negligence Claim Against Defendant Board

---

[5] Specifically, Plaintiff asserts Defendant Bosco suggested M.G. would indeed be found innocent because he was "young," and this was his "first offense." (Doc. No. 1, p. 13). Defendant Bosco also allegedly warned female students at a school assembly that the school "could not protect them if they went into the woods," and notified the male students that the "price [they] pay for being men" involves being "treated as guilty until proven innocent." Id. at p. 15.

Defendant Board also seeks dismissal of Plaintiff's Negligent Training, Retention, and Supervision claim against it (Count VI). (Doc. No. 19-1, p. 15). In Plaintiff's Opposition Motion to Defendant Board's Motion to Dismiss, she concedes the Board is immune to negligence suits and withdraws Count VI of her complaint. (Doc. No. 22, p. 14). Accordingly, Defendant Board's Motion to Dismiss Count VI is GRANTED with prejudice.

### 4. § 1983 Claim Against Defendant Bosco

Defendant Bosco seeks dismissal of Plaintiff's § 1983 claim based on student-on-student sexual harassment in violation of Title IX and the Fourteenth Amendment Equal Protection Clause. Plaintiff has sued Defendant Bosco in both his individual and official capacities. (Doc. No. 1, p. 1). Both the Supreme Court and Fourth Circuit have held claims against school administrators in their official capacity when the school board is also a defendant are duplicative in nature and should be dismissed. See Love-Lane v. Martin, 355 F.3d 766, 783 (4th Cir. 2004) (citing Kentucky v. Graham, 473 U.S. 159, 165-66, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985)). Accordingly, to the extent the claims against Defendant Bosco are premised on him acting in his official capacity, Defendant Bosco's Motion to Dismiss is GRANTED with prejudice.

Turning now towards the § 1983 claim against Defendant Bosco in his individual capacity (Count II), Defendant Bosco argues it should be dismissed because he is entitled to a defense of qualified immunity. "Qualified immunity protects officials 'who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful.'" Booker v. South Carolina Dep't of Corrections, 855 F.3d 533, 537-38 (4th Cir. 2017) (quoting Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc)). "The doctrine weighs two important values—'the need to hold public officials accountable when they exercise power

20

irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" Id. (quoting Pearson v. Callahan, 555 U.S. 223, 231, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009); see also Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992) ("Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines."). As the Supreme Court has noted, qualified immunity "is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (emphasis in original).

In determining whether qualified immunity shields a defendant from suit, courts employ a two-step inquiry. For the first prong, a plaintiff must allege that his or her constitutional rights were infringed by the conduct at issue. Booker, 855 F.3d at 538; see also Pearson, 555 U.S. at 232, 241, 129 S. Ct. at 821 (describing the inquiry for qualified immunity); Winfield v. Bass, 106 F.3d 525, 530 (4th Cir. 1997) (en banc). The second inquiry is "'whether the right violated was clearly established' at the time of the official's conduct.'" Booker, 855 F.3d at 538 (quoting Melgar ex rel. Melgar v. Greene, 593 F.3d 348, 353 (4th Cir. 2010). "[F]or the law to be clearly established, officials must have 'fair notice' that their conduct violated the plaintiff's constitutional right." Feminist Majority Found. v. Hurley, 911 F.3d 674, 722 (4th Cir. 2018) (Agee, J., concurring in part and dissenting in part) (quoting Hope v. Pelzer, 536 U.S. 730, 739-41 (2002)).

Regarding the first prong of the qualified immunity, the Fourth Circuit has held that "a victim of student-on-student sexual harassment can pursue an equal protection claim predicated on a school administrator's deliberate indifference to such harassment." Feminist Majority Found., 911 F.3d at 702 (majority opinion); see also Fitzgerald v. Barnstable Sch. Comm., 555 U.S. 246,

21

257-58, 129 S. Ct. 788, 797-98, 172 L. Ed. 2d 582 (2009); Jennings v. Univ. of N.C., 482 F.3d 686, 701 (4th Cir. 2007). However, as far as the second prong is concerned, the Feminist Majority court held the right to be free from student-on-student sexual harassment was not "clearly established by either controlling authority or by a robust consensus of persuasive authority" at the time of the alleged conduct by the defendant school administrator—which was 2014-2015.[6] Feminist Majority Found., 911 F.3d at 706.

Here, Defendant Bosco is entitled to qualified immunity for his alleged deliberate indifference to Plaintiff's right to be free from student-on-student sexual harassment and abuse. The Complaint only references Defendant Bosco's alleged conduct between October 2014 and early 2015. (Doc. No. 1, pp. 10-14). This is almost the exact same time frame as alleged in Feminist Majority. See Feminist Majority Found., 911 F. 3d at 680-85. Accordingly, because the right to be free from student-on-student sexual harassment was not clearly established by controlling authority or by a robust consensus of persuasive authority at the time of Defendant Bosco's alleged conduct, the Court hereby GRANTS his Motion to Dismiss Count II.

### 5. Negligence and Obstruction of Justice Claims Against Defendant Bosco

Defendant Bosco also argues for dismissal of both the negligence claims against him (Counts IV and V), and the obstruction of justice claim against him (Count VII). (Doc. No. 19-1, pp. 14-16). His argument is based on the defense of public official immunity. Id. Thus, Plaintiff needs to sufficiently allege Defendant Bosco acted maliciously, willfully, deliberately, or in bad

---

[6] In her Opposition Motion, Plaintiff argues the right to be free from student-on-student sexual harassment was clearly established by federal guidance promulgated by the Department of Education between 2001 and 2014. (Doc. No. 22, p. 9). The Supreme Court has made clear that it is "the state of the *law*," not non-binding federal guidance, which matters when determining if a right is clearly established. Hope v. Pelzer, 536 U.S. 730, 741, 122 S. Ct. 2508, 2516, 153 L. Ed. 2d 666 (2002) (emphasis added) ("[T]he salient question that the Court of Appeals ought to have asked is whether the state of the law . . . gave respondents fair warning that their alleged treatment . . . was unconstitutional.").

faith with respect to the conduct alleged to overcome public official immunity at the pleading stage. Considering the greater context of the entire Complaint, this Court thinks Plaintiff has sufficiently pled facts to overcome public official immunity with respect to Defendant Bosco and the state law tort claims against him. Accordingly, the Court DENIES his Motion to Dismiss Counts IV, V, and VI without prejudice. Defendant Bosco is free to raise any defenses at summary judgment.

### C. Defendants City and Putney's Motion to Dismiss

In their Motion to Dismiss, Defendants City and Putney argue they should be dismissed from Count III of Plaintiff's Complaint because the Complaint fails to state a claim for which relief can be granted under both the Equal Protection Clause and Title IX, and it likewise fails to establish a § 1983 municipal liability claim. (Doc. No. 25-1, pp. 4-6). Defendants City and Putney further argue they should be dismissed from Count VI because the Complaint fails to state a prima facie negligence claim under North Carolina law. (Doc. No. 25-1 p. 13). Finally, Defendants City and Putney argue they should be dismissed from the case in its entirety because governmental immunity bars Plaintiff's claims as to them.  See generally (Doc. No. 25-1). For the reasons discussed below, Defendant City and Putney's Motion to Dismiss is hereby GRANTED.

### 1. Equal Protection

Plaintiff's Complaint fails to plausibly allege Defendants City and Putney violated her Constitutional right to be free from sexual harassment in an education setting.  In Count III, Plaintiff simply alleges Defendants City and Putney had a "duty to train its employees and agents . . . on how to . . . comply with related constitutionally and federally protected rights, such as those found under the Equal Protection Clause," (Doc. No. 1, p. 24), and that the Defendant's failure to

23

train "subjected Ms. Roe to the deprivation of her constitutional rights under the Equal Protection Clause." (Doc. No. 1, pg. 26). Plaintiff does not allege sufficient facts to allow this Court to infer that Defendants City and Putney acted with intentional "discriminatory intent" in their failure to train, or that this failure to train caused Defendant Leak to treat Plaintiff differently than other similarly situated individuals. Accordingly, Defendant City and Putney's Motion to Dismiss with respect to the Equal Protection claims against them is GRANTED.

## 2. Title IX

Defendants City and Putney also move to dismiss the Title IX claim against them (Count III). Title IX provides that "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a) (2018). It is well-settled that student-on-student sexual harassment qualifies as discrimination under Title IX. Davis Next Friend Lasorda D. v. Monroe City Bd. Of Educ., 526 U.S. 629, 650, 119 S. Ct. 1661, 1674, 143 L. Ed. 2d 839 (1999) (citing Bennett v. Kentucky Dep't of Educ., 470 U.S. 656, 665-66, 105 S. Ct. 1544, 84 L. Ed. 2d 590 (1985)). However, a Title IX claim is only actionable against an educational program receiving federal funds. 20 U.S.C. § 1681 (a). As the Fourth Circuit has not yet had an opportunity to clearly define exactly what constitutes an "educational program" under Title IX, this Court finds the following cases from the Second and Third Circuits instructive: O'Connor v. Davis, 126 F.3d 112 (2d Cir. 1997) and Doe v. Mercy Catholic Med. Ctr., 850 F.3d 545 (3d Cir. 2017).

In O'Connor v. Davis, the plaintiff—a social work student completing an internship—filed a Title IX claim against her internship site, a state-run hospital, after a co-worker sexually harassed

her during her internship. O'Connor, 126 F.3d at 113. The plaintiff asserted that her internship site, was subject to Title IX regulations because the hospital received federal funds "through the state . . . [and] . . . operate[d] . . . an organized educational program. Id. at 116. The court rejected the plaintiff's argument and first noted that "in order to implicate Title IX in the first instance, an entity must have features such that one could reasonably consider its mission to be, at least in part, educational." Id. at 117. The court further explained that to impute a status of "educational program" onto the hospital, the plaintiff must point to factors such as the existence of an institutional affiliation between her school and hospital, a written agreement between the institution, or the sharing of staff or funds between the school and hospital. See id. at 118. The court ultimately affirmed a grant of summary judgment in favor of the hospital precisely because the state-run hospital had "no affiliation to any educational institution whatsoever" and simply "allow[ed] volunteers from a nearby college to perform . . . volunteer work at its facility." Id. at 119.

In Doe v. Mercy Catholic Med. Ctr., the Third Circuit came to the opposite conclusion and vacated the district court's dismissal of a Title IX claim against a hospital by a plaintiff participating in the hospital's residency program. See Doe, 850 F.3d at 549. The court determined that the hospital defendant was indeed an "educational program" for purposes of Title IX because it had "features such that one could reasonably consider [the hospital's] mission to be, at least in part, educational." Id. at 555 (quoting O'Connor, 126 F.3d at 117). The court emphasized that an educational program would likely have some or all of the following features: the program is structured around "a particular course of study or training"; the "program allows participants to earn a degree or diploma"; the program "provides instructors [or] examinations"; or, the "entity

25

offering . . . or otherwise regulating a program hold[s the program] out as educational in nature." Id. at 556. The court explained that "whether a program or activity is sufficiently educational under Title IX is a mixed question of law and fact." Id. The court ultimately concluded the plaintiff sufficiently alleged the existence of an "institutional affiliation" between a medical school and the defendant hospital such that the hospital was educational in nature because the two entities "shared staff, funding, and other support." Id. at 558 (quotation and citation omitted).

Here, Defendants City and Putney specifically argue that Plaintiff failed to state a claim under Title IX with respect to them because the Complaint "failed to establish that either Defendants were recipients of federal funding from the United States Department of Education." (Doc. No. 25-1, p. 6). Plaintiff's argument in response points to 34 C.F.R. § 106.1, which provides that "[T]itle IX . . . is designed to eliminate discrimination on the basis of sex in any education program or activity receiving Federal financial assistance, whether or not such program or activity is offered or sponsored by an educational institution." (Doc. No. 28, p. 7). Thus, at issue is whether Plaintiff has plausibly alleged in her Complaint that Defendants City and Putnam's participation in the SSRO program amounts to an educational program or activity.

Plaintiff has not met her burden in this regard. Plaintiff's Complaint simply alleges Defendant City has "final policymaking authority over CMPD," (Doc. No. 1, p. 23), and Defendant Putney has "final policy making authority regarding the development of and training for the SSRO program." (Doc. No. 1, p. 24). Plaintiff's sole allegation to support the existence of an institutional affiliation between Defendants City, Putney, and CMS is North Carolina General Statute § 160A-288.4 (2020), which provides that "the chief of police of a local police department . . . may establish a volunteer school safety resource officer program to provide nonsalaried special law

26

enforcement officers to serve as school safety resource officers in public schools." N.C. Gen. Stat. § 160A-288.4(a) (2020). The grant of authority allowing a police chief to establish a volunteer program with a local school receiving federal funds does not support a plausible inference that would allow one to reasonably conclude the police entity's mission is educational in nature. Plaintiff has not provided facts such as the sharing of funds, salaried staff, or other support between Defendant City, Defendant Putnam, and Defendant CMS, nor has Plaintiff alleged that the SSRO program has any features characteristic of an educational program. Accordingly, because Plaintiff has not met the threshold burden of alleging that Defendants City and Putnam's participation in the SSRO program is educational in nature, Defendant's Motion to Dismiss the Title IX claims against them is GRANTED.

### 3. § 1983 Municipal Liability

Defendants City and Putney also challenge Count III of Plaintiff's Complaint and argue Plaintiff failed to sufficiently state a claim for § 1983 municipal liability. (Doc. No. 25-1, pp. 6-12). Specifically, they argue Plaintiff does not plausibly allege deliberate indifference or causation, both of which are required to state a claim for § 1983 municipal liability. (Doc. No. 25-1, pp. 7, 10).

It is well-settled law that municipalities can be subject to § 1983 liability. <u>Monell v. Dep't of Soc. Servs. Of City of N.Y.</u>, 436 U.S. 658, 690, 98 S. Ct. 2018, 2035, 56 L. Ed. 2d 611 (1978) ("Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."). When § 1983 municipal liability is premised on failure to train, as it is

here, "the failure to train [must] amount to deliberate indifference to the rights of the [victims]. . . . Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality . . . can a city be liable for such a failure under § 1983." City of Canton, Ohio v. Harris, 489 U.S. 378, 388-89, 109 S. Ct. 1197, 1204-05, 103 L. Ed. 2d 412 (1989). This deliberate indifference standard "ensures that a municipality either knew or should have known about the deficiency, so it [can] remedy that deficiency." Estate of Jones by Jones v. City of Martinsburg, W.V., 961 F.3d 661, 672 (4th Cir. 2020). It is not sufficient for a plaintiff to presuppose that a deficiency exists *because* a rights violation occurred. See id. (holding that the plaintiff did not show deliberate indifference when the plaintiff argued a single rights violation "makes obvious" that the municipality was deficient in training a police officer).

At the outset, this Court notes that Plaintiff failed to plausibly allege Defendants City and Putney violated her rights under either the Equal Protection Clause or Title IX. There can be no § 1983 liability if no rights have been violated by the defendant in question. Thus, Defendants City and Putney simply cannot be subject to § 1983 liability based on the allegations in the Complaint. However, even if Plaintiff had plausibly alleged a violation of rights at the hands of Defendants City and Putney, the factual allegations in Plaintiff's Complaint do not sufficiently plead deliberate indifference or causation. The Complaint alleges Defendants City and Putney are subject to § 1983 liability solely on the basis that they failed to train Defendant Leak, and other officers "on how to prevent and respond to sexual offenses, dating violence and stalking, as well as comply with related constitutional rights, such as those found under the Equal Protection Clause." (Doc. No. 1, p. 25). This failure to train, Plaintiff alleges, is what "subjected [her] to the deprivation of her" constitutional and federal statutory rights. (Doc. No. 1, p. 26). However,

28

without pointing to any policy, or any deficiency in training Defendant Leak specifically,[7] it is impossible for this Court to infer that either Defendant City or Defendant Putney made a conscious choice to deliberately disregard any training standards such that they were deliberately indifferent to Plaintiff's constitutional and statutory rights. Accordingly, Defendant City and Putney's Motion to Dismiss Count III of the Complaint as to them is hereby GRANTED.

### 4. Negligence – Negligent Supervision, Training, and Retention

Defendants City and Putney next move to dismiss Count VI of Plaintiff's Complaint—the negligent training, retention and supervision claims. Specifically, Defendants argue the Complaint does not allege facts that lead to a plausible inference that Defendants had actual or constructive notice of Defendant Leak's incompetence and/or negligence. (Doc. No. 25-1, p. 14).

In North Carolina, to succeed on a negligent supervision claim, a plaintiff must show the following:

> (1) The specific negligent act on which the action was founded . . . (2) incompetency, by inherent unfitness or previous specific acts of negligence, from which incompetency may be inferred; and (3) either actual notice to the employer of such unfitness or bad habits, or constructive notice, by showing that the [employer] could have known the facts had he used ordinary care in oversight and supervision, . . . and (4) that the injury complained of resulted from the incompetency proved.

Cloaninger ex rel. Estate of Cloaninger v. McDevitt, 555 F.3d 324, 337 (4th Cir. 2009) (citing

Medlin v. Bass, 327 N.C. 587, 398 S.E. 2d 460, 462 (1990)). The notice element requires a plaintiff

---

[7] The Complaint alleges Defendant Leak claimed M.G.'s threat to use his gun was not "reasonable duress," and that Defendant Leak did not report the alleged sexual abuse to Plaintiff's parents, but there are no additional facts to support an inference that Defendant Leak's actions were a result of city-wide policy or training deficiencies implemented by Defendants City and Putney. (Doc. No. 1, p. 12). To the contrary, the Complaint refers to N.C. Gen. Stat. § 160A-288.4 to establish that Defendant Putney is responsible for training Defendant Leak as an SSRO, but the statute makes clear that any SSRO must "receive training on research into the social and cognitive development of . . . high school children." Id. § 160A-288.4(a). Without providing any facts about the specific SSRO training promulgated by Defendants City and Putney, and received by Defendant Leak, this Court cannot assume that Defendants City and Putney flouted state law when implementing the SSRO program and/or in training SSROs like Defendant Leak.

to prove that "prior to the employee's tortious act, the employer knew or had reason to know of the employee's incompetency." Id. (quoting Barker v. Kimberly-Clark Corp., 136 N.C. App. 455, 524 S.E. 2d 821, 827 (2000)).

Here, Count VI of Plaintiff's Complaint does not sufficiently establish the notice requirement of a negligent supervision and retention claim under North Carolina law. Assuming *arguendo* Defendant Leak acted negligently and/or incompetently when he responded to Plaintiff's report of sexual assault, the Complaint contains no allegations that either Defendant City or Defendant Putney knew or had reason to know that Defendant Leak was an incompetent employee. The sole allegation of actual or constructive knowledge by Defendants City and Putney is found on page 32 of the Complaint: "Defendants City and Putney would have prevented this misconduct by Defendant Leak upon actual or constructive notice of his incompetence and inherent unfitness, especially knowing that an SSRO is assigned to ensure the security and welfare of predominantly minor students." (Doc. No. 1, p. 32). From this allegation alone, it is impossible for the Court to infer that Defendant City and Putney had actual or constructive notice of Defendant Leak's incompetence by simply "knowing" that an SSRO is assigned to monitor a population with heightened sensitivities. Accordingly, Defendant City and Putney's Motion to Dismiss Count VI of the Complaint with respect to them is GRANTED.

### 5. Governmental Immunity

Finally, Defendants City and Putney argue that all claims against them should be dismissed because of sovereign immunity and because the claims against Defendants City and Putney are duplicative. (Doc. No. 25-1, p. 15). Defendants City and Putney note that Defendant Putney is sued in his official capacity, which the Supreme Court has indicated should be "treated as a suit

30

against the entity." <u>Kentucky v. Graham</u>, 473 U.S. 159, 166, 105 S. Ct. 3099, 3105. 87 L. Ed. 2d 114 (1985). Accordingly, Defendant Putney's Motion to Dismiss the claims against him in his official capacity is GRANTED with prejudice.

Turning to Defendant City's assertion that Plaintiff failed to establish the City's waiver of governmental immunity, the Court agrees with Defendant City. In her Complaint, Plaintiff cites to N.C. Gen. Stat. § 160A-485.5 as support for the allegation that "the City has expressly waived its governmental immunity." (Doc. No. 1, p. 6). Plaintiff has improperly relied on this statute alone—under N.C. Gen. Stat. § 160A-485.5, "a municipality *may*, but is not required to, waive immunity to the extent that the municipality is indemnified by an insurance contract." <u>Talley v. City of Charlotte</u>, 2016 WL 8679235 at *5 (W.D.N.C July 22, 2016); <u>see</u> <u>also</u> N.C. Gen. Stat. § 160A-485.5 (2020). Plaintiff's Complaint makes no reference to any insurance policy held or ordinance passed by the City of Charlotte that would constitute a waiver of immunity pursuant to N.C. Gen. Stat. § 160A-485.5. Accordingly, this Court agrees with Defendant City that Plaintiff's claims against Defendant City are barred by sovereign immunity. Defendant City's Motion to Dismiss Plaintiff's Complaint with respect to the City is GRANTED.

**CONCLUSION**

IT IS THEREFORE ORDERED that Defendant Leak's Motion to Dismiss (Doc. No. 26) is GRANTED, Defendants Board and Bosco's Motion to Dismiss (Doc. No. 19) is GRANTED IN PART and DENIED IN PART, and Defendants City and Putney's Motion to Dismiss (Doc. No. 25) is GRANTED.

IT IS SO ORDERED.

Signed: September 22, 2020

Frank D. Whitney
United States District Judge

32